IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. No. 05-00548 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER SUPPRESSING EVIDENCE |
| vs. | ) | |
| | ) | |
| EDWARD LAFAELE (01), and | ) | |
| WESSA TANUPO (02), | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER SUPPRESSING EVIDENCE

I.      INTRODUCTION.

Defendants Edward Lafaele and Wessa Tanupo move to suppress evidence obtained by the Government in a search of the home at 94-048 Poalani Circle, Waipahu, Hawaii, on December 5, 2005.  Law enforcement agents entered the home to conduct the search upon the triggering of a beeper they had placed in a package used in a controlled delivery to the home.  While agents had an anticipatory search warrant, they did not have a warrant to put that beeper into the package or to monitor the beeper. The warrantless placement and monitoring of the beeper violated Defendants' Fourth Amendment rights.  As the Government has not shown that the inevitable discovery doctrine applies here, the court grants the motion to suppress.[1]

---

[1] This ruling is in no way influenced by Tanupo's counsel's outburst at the hearing on September 28, 2006.  In the outburst, Tanupo's counsel, reacting to an evidentiary ruling by the court, challenged the court's impartiality.  Tanupo's counsel

II.      FINDINGS OF FACT.

The hearing on Lafaele's motion to suppress began on September 14, 2006. Defendants came to court on that date not intending to present any live evidence relating to Lafaele's standing to seek suppression, a matter the Government's brief had made clear the Government was challenging. To allow Defendants

---

likened the court's actions in the present case to the court's actions in an unrelated case involving Tanupo's counsel. The court was taken aback for a number of reasons. First, the focus of the hearing at the time of the outburst concerned Lafaele's standing to move to suppress, rather than anything directly affecting Tanupo, who clearly did have standing to seek suppression. Second, in the unrelated case, Tanupo's counsel had apologized on the record to the court for a similar outburst and had appeared satisfied that the court had not acted out of bias. Third, the vehemence of counsel's remarks seemed disproportionate to the scope of the evidentiary ruling immediately preceding the accusation. Fourth, as matters were unfolding at the hearing, the court was becoming increasingly inclined to rule in Defendants' favor. Apparently misreading the judge's leaning, Tanupo's counsel orally moved for the judge's recusal. Lafaele's counsel hastened to disassociate himself from the request. The court announced that it would stop the hearing on the suppression motion to allow Tanupo's counsel to brief the recusal request. Then, as quickly as the outburst had come, it dissipated. Tanupo's counsel abruptly withdrew the recusal request and stated that Tanupo would proceed with the suppression hearing. The hearing then continued without incident, and, at its conclusion, the court took the matter under advisement.

The court recounts this event only out of concern that Tanupo's counsel not see the present ruling as somehow related to his outburst. The outburst puzzled but has neither intimidated nor otherwise affected the judge. It has had no effect on the substance of the present ruling. No part of the present order, whether favorable or unfavorable to Tanupo, results from the outburst or from the withdrawn challenge to the judge's impartiality. Tanupo's counsel should not assume that repeating the outburst will lead to a ruling as favorable to his client as the present ruling, or, conversely, that the outburst will somehow contribute to or lead to any adverse ruling any of his clients may receive.

to prepare (belatedly) to present such evidence, and to allow Tanupo to supplement her cursory joinder in Lafaele's motion, the court continued the hearing until September 28, 2006.  Stating that in fairness it would also permit the Government to present live evidence at the continued hearing, the court made specific reference to evidence that was relevant to the inevitable discovery issue.

The only live testimony offered at the September 28, 2006, hearing, was by Lafaele and Tanupo.[2]  Based on that testimony, Exhibit 4 admitted at the hearing, and the various warrants and applications for warrants that are in court records in this case and that this court takes judicial notice of, the court finds the following by a preponderance of the evidence.[3]

1.  Tanupo shared a rented house at 94-048 Poalani Circle.  The house was owned by Gloria Yoro, who was one of several other residents there.

---

[2] In an effort to rule promptly and to avoid having the court burden the overextended court reporter, this court did not request an expedited certified transcript of the hearing.  The court has reviewed only the "rough" unedited transcript and therefore cannot provide exact page and line citations to testimony.

[3] To the extent any finding of fact should more properly be designated a conclusion of law, it should be treated as a conclusion of law.  Similarly, to the extent any conclusion of law should more properly be designated a finding of fact, it should be treated as a finding of fact.  For ease of reference to particular findings and conclusions in later proceedings, the findings and conclusions are presented in numbered paragraphs.

2. Lafaele is and, in December 2005, was Tanupo's boyfriend. Although he considered his father's home at 1120 Desha Lane to be his mailing address, for a number of months he had been staying overnight at Tanupo's Poalani Circle home, sometimes as often as four nights a week. When arrested on December 5, 2005, he told law enforcement agents that he did not live in the house, see Ex. 4, but he explained at the hearing that he meant by that statement only that he did not live there every day.

3. Neither Tanupo nor Lafaele had a key to the Poalani Circle house, but they both could come and go as they pleased. Lafaele kept jewelry, a laptop computer, a television, and clothing at the house. A car was registered to him and Tanupo at the Poalani Circle address. Lafaele used the washing machine and provided the only phone for the house's residents. He gave Tanupo between $300 and $500 twice a month for about three months to help her pay for food, rent, and utilities.

4. On Friday, December 2, 2005, Honolulu Mail Processing and Distribution Center personnel "profiled" an express mail parcel, Number EQ224981847US. This parcel was about 12" x 10" x 8" and weighed approximately 4 pounds, 3 ounces. It was addressed to "Stacy Wong, 94-048 Poalani Circle, Waipahu, HI 96797," and had a return address of: "Bobby Y. Chung, 315 Aviador St., Millbrae, CA 94030." The postage was $27.30. See

Affidavit of R.L. Witt in support of the application for a search warrant for Express Mail Parcel EQ224981847US (Dec. 2, 2005) (Mag. No. 05-00955 KSC) ¶¶ 6-7.

     5.   Postal Inspector R.L. Witt examined the parcel and thought it had several suspicious features common to drug packages.  First, the return address erroneously referred to "Aviador St." instead of "Aviador Avenue," which was the kind of mistake commonly made by people using someone else's address.  Second, Witt could tell by shaking the parcel that there was another container in it, a tactic commonly used by drug traffickers to disguise a parcel's contents.  Third, the shipper had used a commonly available "Ready Post Shipping Carton."  Fourth, the parcel was heavily taped, another tactic used by drug traffickers.  Id. ¶ 8.

     6.   On December 2, 2005, a drug-sniffing dog indicated through its behavior that it detected the odor of a controlled substance in or on the parcel.  Id. ¶ 9.

     7.   That very day, Witt applied for and obtained a search warrant to examine the contents of the parcel.  See Application and Affidavit for Search Warrant, Mag. No. 05-00955 KSC (Dec. 2, 2005) and Search Warrant on Written Affidavit, Mag. No. 05-00955 KSC (Dec. 2, 2005).  The package was searched at 3:30 p.m. that day.  Inside the package was a brick containing 1,040 grams of cocaine, a plastic bag with 153.8 grams of crystal

methamphetamine, and a plastic bag with 39.7 grams of marijuana. See Return on Search Warrant, Mag. No. 05-00955 KSC. (Dec. 5, 2005). The cocaine was in a Post brand "Carb Well" cereal box. The crystal methamphetamine and marijuana were in a CIT brand "Ginko Ginsing Tea" container. See Affidavit of R.L. Witt in support of application for anticipatory search warrant and beeper warrant (Dec. 5, 2005) (Mag. No. 05-00956 KSC).

      8. The following Monday, December 5, 2005, Witt applied for an anticipatory search warrant and a warrant to allow agents to install and monitor a beeper in the parcel. See Application and Affidavit for Anticipatory Search Warrant (Dec. 5, 2005) (Mag. No. 05-00956 KSC). At 10:08 a.m. that day, the Magistrate Judge issued the anticipatory search warrant, which allowed agents to search "94-048 Poalani Circle, Waipahu, HI 96797" within 48 hours of the delivery of the parcel to that address. The anticipatory search warrant also allowed agents to seize, whenever they executed that warrant, the parcel, its contents, the beeper placed in the parcel, and items or personal property tending to identify residents at the address. See Anticipatory Search Warrant on Written Affidavit (signed Dec. 5, 2005; filed Dec. 9, 2005) (Mag. No. 05-00956 KSC).

      9. It is undisputed that agents intended, but inadvertently failed, to obtain from the Magistrate Judge the actual beeper warrant that would have authorized them to place a

6

beeper in the parcel and to monitor the beeper to determine where the parcel with the beeper was and when it was opened.  Agents nevertheless removed the drugs from the parcel, replaced them with fake drugs, installed the beeper, and dusted the contents of the parcel with an invisible fluorescent powder.  See Affidavit of R.L. Witt in Support of Application for Search Warrant (signed Dec. 5, 2005; filed Dec. 6, 2005) ¶ 19 (Mag. No. 05-00961 KSC).

       10.  On the morning of December 5, 2005, an agent posing as a delivery person phoned the residence at 94-048 Poalani Circle.  Lafaele answered the phone and was told that a package addressed to "Stacy Wong" would be delivered that day.  See Lafaele Test.  At approximately 12:30 p.m., Postal Inspector Mitch Tabera, posing as a letter carrier, delivered the parcel to 94-048 Poalani Circle.  Lafaele signed for the package, using the name "Marvin Sease."  See Witt Aff. ¶ 20 (Mag. No. 05-00961 KSC); Ex. 4.  Lafaele took the parcel into the house, and law enforcement agents monitored the beeper for about five minutes before it signaled that the parcel had been opened.  See Witt Aff. ¶ 21 (Mag. No. 05-00961 KSC).

       11.  The agents then entered the house pursuant to the anticipatory search warrant.  Both Lafaele and Tanupo were there.  Id. ¶¶ 22-23.  The agents examined them and determined from the fluorescent powder on Lafaele's hands, hips, and face that he had

handled the parcel.  The agents found the parcel in the kitchen.  <u>Id.</u> ¶ 23; <u>see</u> <u>also</u> Lafaele Testimony.

         12.  Witt then applied for a search warrant to search the entire residence.  <u>See</u> Application and Affidavit for Search Warrant (signed Dec. 5, 2005; filed Dec. 6, 2005) (Mag. No. 05-00961 KSC).  This application was based on the above description of the parcel's journey and the execution of the anticipatory search warrant.  In addition, Witt informed the Magistrate Judge of a controlled delivery of another package on September 7, 2005.  This controlled delivery also involved an express mail parcel wrapped like the one at issue here, including the use of a cereal box.  That other controlled delivery had led to the arrest of two people, including Fatima Liana, as well as the recovery of drugs.  After Liana was arrested, she "made over fifty monitored phone calls to phone number (808) 671-0007.  That number ha[d] been traced to a hard line phone at 94-048 Poalani Circle, Waipahu, Hawaii, the subject residence."  Witt Aff. (Mag. No. 05-00961 KSC) ¶¶ 24-25.

         13.  The Magistrate Judge issued the warrant to search the residence at 5:21 p.m. on December 5, 2005.  <u>See</u> Search Warrant on Written Aff. (signed Dec. 5, 2005; filed Dec. 20, 2005) (Mag. No. 05-00961 KSC).  Various items were then seized at the residence.  <u>See</u> Return on Search Warrant (Dec. 20, 2005) (Mag. No. 05-00961 KSC).

III.     CONCLUSIONS OF LAW.

*Both Lafaele and Tanupo have Standing to Assert Fourth Amendment Violations.*

1. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." See United States v. Place, 462 U.S. 696, 701 (1983).  Lafaele and Tanupo, however, may not challenge an allegedly unlawful search or seizure unless they demonstrate that they have standing to do so. United States v. Armenta, 69 F.3d 304, 308 (9th Cir. 1995). Lafaele and Tanupo therefore bear "the burden of establishing, under the totality of the circumstances, the search or seizure violated [their] legitimate expectation of privacy in a particular place." Id.

2. Standing is not conferred vicariously; even if the Fourth Amendment rights of a third party have been violated, a district court may not suppress evidence unless the defendant has met his or her burden of proving that the challenged search or seizure infringed on his or her personal Fourth Amendment interests. United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). Standing is analyzed based on two factors: "whether the individual, by his conduct has 'exhibited an actual (subjective) expectation of privacy,'" and "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable."'" Smith v. Maryland, 442

U.S. 735, 740 (1979) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  Accord United States v. Davis, 932 F.2d 752, 756 (9th Cir. 1991) ("To contest the legality of a search under the fourth amendment, the defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing an actual subjective expectation of privacy which society is prepared to recognize").

       3.  "Legitimate presence on the premises is . . . relevant to, although not a talisman of, a legitimate expectation of privacy."  United States v. Pollock, 726 F.2d 1456, 1465 (9th Cir. 1984).  Courts therefore examine the circumstances of each case to determine whether a defendant has a legitimate expectation of privacy.  "[A] defendant who enters into an arrangement that indicates joint control and supervision of the place searched may challenge a search of the place where contraband is concealed."  Id.  Accordingly, the Ninth Circuit has found standing under the Fourth Amendment to challenge the search of a house when defendants moved a drug laboratory to that house to avoid detection and then used that house to manufacture drugs.  Id.

       4.  The Ninth Circuit has also found standing when a defendant had a key to the apartment searched, was free to come and go as he pleased, stored things in a locked safe in the apartment, and had previously lived in the apartment.  Davis, 932

F.2d at 757. It was also significant that he paid part of the rent for the apartment, demonstrating partial or joint control over the premises. The Ninth Circuit noted that such joint control "remains significant under the expectation of privacy standard." Id.

        5. The Supreme Court has found that status as an overnight guest alone is enough to show an expectation of privacy in the home that society is prepared to recognize as reasonable. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). However, a defendant's bald claim that he was an overnight guest is insufficient to establish an expectation of privacy that society recognizes, even if the defendant had his wallet, baptismal certificate, and social security card at the home in question, without any clothing or other indicia that he was living or staying there. Armenta, 69 F.3d at 308-09.

        6. Tanupo clearly has standing to challenge the search of 94-048 Poalani Circle on December 5, 2005. She lived in the house and therefore had an actual legitimate expectation of privacy that society recognizes as reasonable.

        7. Lafaele's situation is not as obvious, but this court concludes that he also has standing to challenge the search of 94-048 Poalani Circle on December 5, 2005. Although he used his father's home as his mailing address, he stayed overnight with Tanupo about four times per week at the 94-048 Poalani

11

Circle house.  He came and went as he pleased, even though, like Tanupo, he had no key to the house.  He kept jewelry, a laptop computer, a television, and clothing at the Poalani Circle house. A car was registered to him and Tanupo at the Poalani Circle address.  He used the washing machine and had a phone registered to him at the Poalani Circle house.  An important indication of his right to expect privacy at the home is his contribution of between $300 and $500 twice a month for about three months to Tanupo to help her to pay the rent and utilities for the Poalani Circle house, and to pay for food.  These facts collectively demonstrate that Lafaele had an actual legitimate expectation of privacy in the place searched that society recognizes as reasonable.  See Davis, 932 F.2d. at 757.

*The Search of 94-048 Poalani Circle Violated the Fourth Amendment.*

        8.   Under United States v. Karo, 468 U.S. 705 (1984), the Government's warrantless monitoring of the beeper while the package was in the house violated Defendants' Fourth Amendment Rights.

*Evidence From the Improper Monitoring of the Beeper is Suppressed.*

        9.   Generally, information obtained from the monitoring of the beeper "would therefore be inadmissible at trial against those with privacy interests in the house." Id. at 719.  Such information would be barred by the exclusionary rule, which bars

12

from trial materials obtained either during or as a direct result of an unlawful invasion of a person's Fourth Amendment rights. Evidence seized as a direct or indirect result of the unlawful search cannot constitute proof against the victim(s) of the search.  Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States v. Ramirez-Sandoval, 872 F.2d 1392, 1395 (9th Cir. 1989).  The exclusionary rule therefore extends to what has been called the "fruit" of the illegal search.  However, this "fruit of the poisonous tree" doctrine does not require suppression "simply because [the evidence] would not have come to light but for the illegal actions of the police."  The Supreme Court counsels:

> Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun, 371 U.S. at 487-88 (internal quotation and citation omitted).

        10.  The Ninth Circuit has recognized three exceptions to the "fruit of the poisonous tree" doctrine.  "These three exceptions are the 'independent source' exception, the 'attenuated basis' exception, and the 'inevitable discovery' exception."  Ramirez-Sandoval, 872 F.2d at 1396.  In this case, the Government asserts only that it would have inevitably discovered the evidence.

11.  The Supreme Court examined the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine in Nix v. Williams, 467 U.S. 431, 444 (1984).  Under that exception, when the Government demonstrates by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means, that evidence need not be suppressed.[4]  Id.; Ramirez-Sandoval, 872 F.2d at 1396.

12.  This court had fully expected that both the Government and Defendants would present live evidence in connection with the suppression motion, as both sides appeared to raise issues not fully fleshed out in their papers.  The court expressly invited evidence from both sides.  From Defendants, the court expected evidence going to Lafaele's standing to seek suppression.  The court made this clear to Defendants, and Defendants responded by providing evidence of standing.  From the Government, the court expected some attempt to meet the Government's burden of establishing inevitable discovery.  Again, the court made that clear to the Government, but the Government provided no evidence on that score.  Instead, the Government only

---

[4] The "independent source" exception allows the admission of evidence "that is actually found by legal means through sources unrelated to the illegal search." Ramirez-Sandoval, 872 F.2d at 1396.  The "attenuated basis" exception allows the admission of evidence "when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality." Id.

argued that, because it had an anticipatory search warrant, Government agents would have entered the residence within 48 hours of the package's delivery and would have found all of the evidence it ultimately recovered. This argument has no support in the record.

      13.  No Government agent testified that he or she intended to enter the residence at any specific time or within any particular time frame. Had the Government not been monitoring the beeper, it is certainly possible that law enforcement agents would not have entered the house at all. They might have seen the box being taken into a car that they would have followed without ever going into the house to execute the anticipatory search warrant. Without the beeper, agents would not have known when to enter the house. They might have let the 48-hour period for the anticipatory search warrant expire without entering the house, or, if they did enter the house, it might have been after the box had been emptied, crushed, and thrown out in an opaque garbage bag that agents would not have checked. There is no evidence that agents would have inevitably discovered anything through the anticipatory search warrant.

      14.  Even assuming agents would have entered the house to execute the anticipatory search warrant without the beeper and would have gotten some evidence, the Government presented no evidence as to what that evidence would likely have been. For

example, had agents not been monitoring the beeper, they might not have entered the house until after Lafaele had showered, washed his clothes, and left the premises. Under those circumstances, the fluorescent powder might not have been found on him or his clothing. He might not have been at the house when it was searched and might not have made any statement to agents. Tanupo might also have left the residence.

        15. Because the Government has failed to demonstrate by a preponderance of the evidence that it would have inevitably discovered any evidence, all evidence derived from the execution of the anticipatory search warrant is suppressed. This means that, at trial, the Government may not offer evidence that Lafaele and Tanupo were at the house when the anticipatory search warrant was executed, that the package was opened at the house, or that Lafaele had fluorescent powder on his body. Nor may the Government offer statements Lafaele made after the search, including Ex. 4, as there is no evidence Lafaele would have provided any statement but for the execution of the anticipatory search warrant arising out of the Government's unconstitutional monitoring of the beeper.

        16. The Government may introduce evidence at trial indicating that Lafaele signed for the package and that Lafaele and Tanupo had been staying at the residence. The Government may also use evidence at trial derived from the search warrant issued

after the agents had secured the residence and located the parcel.  In Karo, the Supreme Court recognized that, if an affidavit supporting a search warrant supports a finding of probable cause even in the absence of tainted evidence, a warrant may still be valid.  Karo, 468 U.S. at 719.  When this court redacts the tainted information (i.e., information derived from the improper monitoring of the beeper) from Witt's application for the warrant to search the residence, the court concludes that there was still probable cause to believe that there was evidence of a crime at the residence.

       17.  Because the court is suppressing the evidence here, the court does not reach Tanupo's argument that she did not receive a copy of the anticipatory search warrant.

## IV.   CONCLUSION.

The motion to suppress is granted, as set forth above.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 5, 2006.

/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

**United States of America v. Lafaele, et al.**, **Crim. No. 05-00548 SOM; ORDER SUPPRESSING EVIDENCE.**